**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

MICHAEL JERMAINE GREENE,

     Plaintiff,

v.                            Case No. 2:17-cv-02897

DAVID BALLARD, Warden, *et al.*,

     Defendants.

## PROPOSED FINDINGS AND RECOMMENDATION

This matter, which is assigned to the Honorable John T. Copenhaver, Jr., Senior United States District Judge, and referred to the undersigned United States Magistrate Judge for submission of proposed findings and recommendations for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B), is before the court for screening of certain claims contained in the Second Amended Complaint (ECF No. 79) pursuant to 28 U.S.C. §§ 1915A and 1915(e)(2)(B).[1]

### I.    *FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY*

This matter, which has a convoluted procedural history, is proceeding on a prolix Second Amended Complaint (ECF No. 79) granted in conjunction with the dismissal of

---

[1] Defendants David Ballard, Margaret Clifford, Jonathan Frame, Andy Mitchell, and Sherrill Snyder (the spelling of whose name was earlier corrected) were previously served with process and filed a prior Motion to Dismiss on some of the allegations against them in this Second Amended Complaint. On March 27, 2020, the Motion to Dismiss was granted in part, and denied in part, by the presiding District Judge. (ECF No. 211). Specifically, the court granted the Motion to Dismiss with respect to all allegations concerning Plaintiff's alleged monitoring by correctional staff via a liquid item placed in his body, which was found to be frivolous, and his Eighth Amendment claims concerning denial of medical care brought against these specific defendants. (*Id.* at 6). However, the court found that there are other claims against these defendants alleged in the Second Amended Complaint that were not addressed in their Motion to Dismiss that warrant further consideration. Thus, the Motion to Dismiss was otherwise denied and the matter was again referred to the undersigned for additional proceedings. (*Id.*)

four other civil actions filed in this court by Michael Jermaine Greene (hereinafter "Plaintiff") (Case Nos. 2:18-cv-00414; 2:18-cv-00469; 2:18-cv-00905; and 2:18-cv-00946), which asserted many of the same allegations set forth in the Second Amended Complaint herein.  The granting of the Second Amended Complaint superseded all other complaint documents and resulted in the addition of approximately 50 new proposed defendants beyond the five defendants named in the initial complaint herein.  The Second Amended Complaint summarizes Plaintiff's claims as follows:

> [A]ll of the defendants, while acting under color of state law, have retaliated against [Plaintiff] for filing grievances, seeking redress from the courts, been deliberately indifferent to [Plaintiff's] serious mental health and medical needs, violated his rights to due process of law, used excessive force, punished [Plaintiff] for seeking their help, and all of this has been done to [Plaintiff] with cruel, sadistic, and evil intent.  The herein complaint and amended complaint defendants as described violated [Plaintiff's] U.S. Constitutional Rights [under the] 1st, 4th, 5th, 8th, 9th, and 14th Amendments to the United States Constitution, as well as article III, sections 1, 5, and 10 of the Constitution of West Virginia, and other various state laws such as assault and battery.

(ECF No. 79 at 17, ¶ 32).  However, as further addressed herein, Plaintiff fails to tie many of these conclusory allegations to specific conduct by the various individual defendants.

The numerous allegations in the lengthy and verbose Second Amended Complaint are not arranged in chronological order or any other coherent fashion.  Thus, the undersigned will first attempt to condense and group the remaining factual allegations into the following types of claims: (1) deliberate indifference to Plaintiff's serious medical and mental health needs; (2) the use of excessive force against Plaintiff by various correctional officers; (3) the failure to protect Plaintiff from assaults by inmate gang members; (4) claims of tampering with or withholding of Plaintiff's mail; (5) claims of tampering with Plaintiff's inmate trust account balance; and (6) other general claims of

retaliatory or wrongful conduct allegedly motivated by Plaintiff's filing of lawsuits and grievances.

Plaintiff was previously incarcerated at the Huttonsville Correctional Center ("HCC"), located in Huttonsville, West Virginia, which is within the jurisdiction of the United States District Court for the Northern District of West Virginia. While housed at HCC, Plaintiff filed two lawsuits against various employees who worked there. *See Greene v. Shiflett*, No. 3:16-cv-00141 and *Greene v. Feaster*, No. 5:16-cv-00051. In October of 2016, Plaintiff, who has been diagnosed with hypertension and polycystic kidney disease, suffered an apparent seizure that led to him being treated by medical personnel at Ruby Memorial Hospital ("Ruby") in Morgantown, West Virginia. He returned to HCC on October 12, 2016, where he was housed in a segregation unit until October 26, 2016. (ECF No. 79 at 3, ¶ 2).

A.     *Allegations concerning mental health treatment*

On or about October 26, 2016, Plaintiff was transferred to the Mount Olive Correctional Complex ("MOCC") and placed in the Mental Health Unit ("MHU"). (*Id.* at 3-4, ¶ 4). Plaintiff claims that he was hearing voices and hallucinating. (*Id.*) He further claims that his hospital discharge papers suggested that he undergo "cognitive behavioral therapy." (*Id.*) The Second Amended Complaint further alleges that Plaintiff was put on Effexor, an anti-depressant, after he engaged in self-harm by cutting his wrist, but he claims the medication did not help. (*Id.*) Plaintiff summarily asserts that the MHU staff "ignored [his] problems" and "lied to him to make him stop speaking of the issues." (*Id.*) He further generally avers that his mental health issues were never managed and got worse. (*Id.*) He further asserts that he "started filing grievances" and "request forms to leave MHU," but claims that "staff did not respond." (*Id.*) However, on or about

December 8, 2016, after allegedly filing one such grievance, he was moved to the mainline population as he had requested.  (*Id.*)

Although the Second Amended Complaint, as further amended by ECF No. 186, lists MHU staff members Shannon Coleman ("Coleman"), Brandon Deem ("Deem"), Tim Carper ("Carper"), Sara Cooper ("Cooper"), and Sherrill Snyder ("Snyder") as defendants, it contains no specific facts concerning each defendant's alleged failure to treat him.  (*Id.* at 4, ¶ 4).[2]  Rather, Plaintiff just summarily alleges that "all the MHU staff" ignored his problems, failed to give him needed therapy, and harassed and lied to him "in retaliation for him seeking redress from the courts after filing grievances at HCC."  (*Id.* at 15-16, ¶ 28).    Additionally, in paragraph 15 of the Second Amended Complaint, Plaintiff summarily alleges that, although he was being seen by Cooper "about his mental issues" while he was on lockdown in May and June of 2017, "she refused to speak to him about things he needed done for his issues," allegedly "using this lawsuit against him for him to dismiss Case No. 2:17-cv-02897."  (*Id.* at 10, ¶ 15).

### B.    Allegations concerning medical treatment

The Second Amended Complaint further alleges that Plaintiff was scheduled to have follow-up appointments with a neurologist and a nephrologist at Ruby on November 30, 2016, but he was never taken back for those appointments after he was told they would have to be rescheduled.  (*Id.* at 4, ¶ 4, at 14, ¶ 26, and at 15, ¶ 28).  Plaintiff further claims that he received no testing or treatment for ringing in his ears.  (*Id.*)  Although the Second Amended Complaint fails to identify the person who allegedly told him his appointments

---

[2]  Plaintiff's amended style of the case and cover letter found in ECF No. 186 removed alleged MHU staff member "Ashley Thomas," "MHU Staff: Thomas (First name)," and "MHU Staff: Ashley (First name)" as a defendant(s).  Thus, the undersigned will not further address that/those individual(s) herein.  By separate order, the undersigned has directed the Clerk to terminate those defendants from the docket sheet.

had to be rescheduled, it appears to allege that Dr. Charles Lye ("Lye") and Physician's Assistant Josh Shrewsberry ("Shrewsberry") were ultimately responsible for his failure to receive any follow-up treatment.  (*Id.* at 4, ¶ 4, at 14, ¶ 26, and at 15, ¶ 28).  Although the style of the Second Amended Complaint, as amended by ECF No. 186, contains the names of nurses Elizabeth Bailes, Kristine Batten, Amanda Jones, and Kelly Foster, the body of the Second Amended Complaint contains no specific factual allegations concerning those defendants' alleged failure to treat his medical needs.[3]

> C.    *Plaintiff's allegations concerning the failure to protect him from threats by other inmates and failure to place him in Special Management*

Plaintiff further claims that sometime between January 1, 2017, and January 19, 2017 (he does not specify this date), while in the mainline population, he was jumped by two members of the Dead Man Incorporated ("DMI") gang.  (*Id.* at 7-8, ¶ 10).  He avers that, after being beaten for about five minutes, Sgt. Andy Mitchell ("Mitchell") intervened. (*Id.*)  Plaintiff avers that he was evaluated by medical staff and then placed back in the same unit, where he claims the gang members who beat him were also being housed.  (*Id.*)

Plaintiff claims that he spoke to Associate Warden of Security Jonathan Frame ("Frame") about this incident and his fear of remaining on the same unit with the DMI gang members, but no action was taken to move him to another unit.  (*Id.*)  Plaintiff also claims that Frame threatened to write him up for a disciplinary violation if he refused to go back to his housing unit.  (*Id.*)  Plaintiff further avers that, on January 19, 2017, he was placed in segregation in the Quilliams II unit after being written up by unidentified correctional officers and "having issues with other inmates."  (*Id.* at 8, ¶ 11).  He further

---

[3] The amended style of the case and cover letter found in ECF No. 186 also indicates that Plaintiff was terminating Nurse Jane Doe #1" as a defendant and the undersigned has, by separate order directed the Clerk to terminate that defendant from the docket sheet.

contends that no disciplinary write-ups were done for the two gang members who attacked him.  (*Id.*, ¶ 10).

Plaintiff further alleges that, several months later, on April 28, 2017, three gang members threatened to stab him while he was on the recreation yard.  (*Id.* at 9-10, ¶ 14). He contends that he told Correctional Officer Matthew Ellis ("Ellis") about these threats. When he subsequently refused to go back to his housing unit, he was moved to the Quilliams I unit and put on lockdown.  (*Id.*)

Plaintiff avers that he completed multiple Special Management requests, which were denied by Snyder, Mitchell, Frame, and David Ballard ("Ballard"), who was then the Warden at MOCC, despite their knowledge of the threats and prior attacks on him by gang members.  (*Id.* at 9-10, ¶ 14 and at 16, ¶ 29).  He further claims that those defendants lied and told him there were no forms to appeal the Special Management denial to the Commissioner of the West Virginia Division of Corrections and that his handwritten appeal to the Commissioner was ultimately denied because he did not use the proper form.  (*Id.* at 9-10, ¶ 14).

> D.   *Allegations regarding uses of force and misconduct against Plaintiff*

Plaintiff's Second Amended Complaint also addresses a series of uses of force against him by various correctional officers during his time at MOCC, which he contends were "excessive" and done with "cruel, sadistic, and evil intent."  The undersigned will address each use of force in turn.

> 1.   First alleged use of force

According to the Second Amended Complaint, sometime between December 8, 2016, and January 10, 2017 (although he does not specify the date), Plaintiff cut his wrist a second time.  (*Id.* at 7, ¶ 8).  He claims that he was taken to the medical unit where he

received stitches and was placed on suicide watch. (*Id.*) He further alleges that, when he refused to remove his clothes, he was taken to the ground by Sgt. Margaret Clifford ("Clifford") and "John Doe #4," whom he now claims is Lt. James Smith ("Lt. Smith"). (*Id.*; *see also* ECF No. 263).[4] Plaintiff further claims that Clifford placed restraints on him while he was on his stomach and that Lt. Smith kneed him and hit him in his face and mouth. (*Id.*) Plaintiff denies fighting or resisting the officers. (*Id.*)

2.      Second alleged use of force

Plaintiff further alleges that he was subsequently moved to another pod within the Quilliams II unit because he threatened to throw apple juice on Mitchell; however, he does not provide a date when this occurred. (*Id.* at 8-9, ¶ 11). The following day, after Mitchell allegedly cussed at him, Plaintiff acknowledges that he followed through with his threat and threw a liquid substance (which he claims to have been apple juice) on Mitchell. (*Id.*) Plaintiff avers that Mitchell then ordered Cpl. James Taylor ("Taylor") to pepper spray Plaintiff, and that the pepper spray "went into [his] eyes and the side of [his] face." (*Id.*) He further claims that he was then moved to the "back of the multy" (the multi-purpose unit), where Lt. Smith punched him in the mouth and stated, "That's for throwing piss on my officer." (*Id.*) Plaintiff claims that, due to this alleged assault, his tooth punctured his lip and he got dizzy. (*Id.*) Plaintiff maintains that he was "not doing anything wrong" and "was not presenting an immediate threat to his own safety or the officers" at the time of these events. (*Id.* at 9, ¶¶ 12-13).

---

[4] Plaintiff's Notice/Request contained in ECF No. 263 indicates that "John Doe #4" is "Lt. James Smith. (ECF No. 263 at 1). To the extent that Plaintiff previously attempted to identify "John Doe #4" as either Lt. Daniel Hahn or Lt. Robert Rhodes, the undersigned will disregard those filings and does not consider Hahn or Rhodes to be defendants herein. By separate order, the undersigned has directed the Clerk to terminate Hahn and Rhodes as defendants. Additionally, because Sgt. Jessie Smith is also named as a defendant herein, the undersigned will refer to this defendant as "Lt. Smith" and Sgt. Jessie Smith as "Sgt. Smith."

3.     Third alleged use of force

Plaintiff further alleges that, on September 21, 2017, Cpl. John Bowlin ("J. Bowlin") and Correctional Officer John Blankenship ("Blankenship") let another inmate throw urine and feces on him and did nothing about it. (*Id.* at 10-11, ¶ 16).  Then, on September 24, 2017, when Plaintiff threw urine on that other inmate, Blankenship attempted to pepper spray him. (*Id.*)  Plaintiff further claims that he filed multiple grievances about these incidents, but Cpt. David McKinney ("McKinney") and Acting Warden Ralph Terry ("Terry") refused to look at video of the incidents and threatened to write him up. (*Id.*) He claims that these actions demonstrated deliberate indifference. (*Id.*)

4.     Fourth alleged use of force

Plaintiff further claims that, on October 20, 2017, "upon false actions," he was pepper sprayed by Sgt. Donald Slack ("Slack") and Correctional Officer Dustin Rose ("Rose") and was then subsequently pepper sprayed by Correctional Officer John Woods ("Woods"), whom he further claims made sexual comments to him. (*Id.* at 12-13, ¶ 22). Plaintiff states that he requested to be moved back to the MHU "for his safety" and "because of retaliation by COs," but Clifford refused to move him and refused to keep Woods away from him after he filed a PREA (Prisoner Rape Elimination Act) complaint against him. (*Id.*)

5.     Fifth alleged use of force

Plaintiff further alleges that, a week later, on October 27, 2017, he again cut his wrist on a piece of broken mirror in his cell and was intentionally pepper sprayed by Correctional Officers Dylan Hayhurst ("Hayhurst") and Matthew Hypes ("Hypes") after he tried to show them his wrist and bring them the piece of glass he had used to cut it, based upon their order to do so. (*Id.* at 13, ¶ 23).  He further contends that Hypes yelled

"Good shot!" (*Id.*)  Plaintiff also claims that these defendants refused to give him a cold shower in the infirmary following this incident.  (*Id.*)

> 6.    Sixth alleged use of force

On December 15, 2017, Plaintiff contends that "Defendant Smith," who appears to be Sgt. Jessie Smith, (hereinafter "Sgt. Smith") refused to let a nurse give him his blood pressure medication.  (*Id.* at 11, ¶ 17).  Plaintiff acknowledges that, on December 28, 2017, he attempted to throw "apple juice" on Sgt. Smith in Quilliams II, Pod 4.  (*Id.* at 11, ¶ 18).  Plaintiff further avers that Sgt. Smith left the pod and went to get a larger pepper spray canister and then twice sprayed it into Plaintiff's cell for over two seconds each time. Plaintiff claims he did nothing but tell them to leave him alone.  (*Id.*)

Plaintiff further alleges that, during this incident, Correctional Officer Matthew Isaac ("Isaac") refused to stop Sgt. Smith or help Plaintiff, who was then left in his cell for 10-15 minutes, until Taylor, Isaac, and Lt. Andrew Hill ("Hill") came and took him out of his cell.  (*Id.*)  Plaintiff further claims that Taylor and Isaac then took him to the "multy" (again, the multi-purpose unit) to see nurse Kristine Batten ("Batten").  (*Id.*)  He further claims that, once out of sight of the cameras, Taylor and Isaac took him to the floor 2-3 times and placed their weight on him when he allegedly did nothing wrong.  (*Id.*) Meanwhile, Hill and Smith went and removed his clothing and other personal property from his cell.  (*Id.*)  Plaintiff claims that his stuff was not returned or replaced until February or March of 2018.  (*Id.*)

> 7.    Seventh alleged use of force

The Second Amended Complaint further alleges that, on January 31, 2018, Sgt. Smith and Correctional Officer Skylar Santiago ("Santiago") allegedly tripped, punched, and threw Plaintiff to the floor while he was cuffed and shackled as they were taking him

back to his cell from a disciplinary hearing.  According to Plaintiff, Sgt. Smith kneed him in the head and face and placed his weight on Plaintiff's head with his knees.  Plaintiff contends that that he "was doing nothing wrong" and that Sgt. Smith did this because Plaintiff pled not guilty in a disciplinary proceeding and "told the truth about Defendant Smith lying . . . ." (*Id.* at 12, ¶ 20).  Plaintiff further claims that these actions were "to bully" Plaintiff in retaliation to "[try] to get the said lawsuit pending at the time dismissed." (*Id.*)  Plaintiff further claims that, since that time, he has not attended any disciplinary hearings "for fear of his safety." (*Id.*)  Plaintiff further contends that Lt. Christopher Wilson ("C. Wilson") responded to the incident, but refused to listen to Plaintiff, and that, in responding to his grievance concerning this incident, Defendant McKinney made it look like it was Plaintiff's fault. (*Id.*)

8.    Eighth alleged use of force

Plaintiff additionally contends that, on July 2, 2018, Sgt. Charles Legg ("Legg") and Correctional Officer Kevin Baker ("Baker") beat him up while he was handcuffed and shackled outside the parole hearing room and again once they were inside an elevator. He further contends that they later allegedly lied about what happened. (*Id.* at 15-16, ¶ 28).  However, he provides no further facts concerning this incident.

E.    *Other alleged acts of retaliation or misconduct by MOCC staff*

The remaining allegations in Plaintiff's Second Amended Complaint consist of indiscriminate acts by various correctional and administrative staff at MOCC.  First, Plaintiff claims that, sometime between January 19 and February 9, 2017, after the first use of force by Clifford and Lt. Smith, and following his filing of a grievance related to that incident, his grievances and other items went missing when unidentified correctional officers went into his cell to pack up his belongings. (*Id.* at 7, ¶ 8).  As noted previously

10

Plaintiff further claims that, on December 15, 2017, Sgt. Smith refused to let a nurse give him his blood pressure medication and lied to the nurse, stating that Plaintiff was refusing his medication.  (*Id.* at 11, ¶ 17).  Plaintiff further claims that between December 29, 2017, and December 31, 2017, Sgt. Smith, Isaac, Taylor, and Santiago denied him food trays. (*Id.* at 12, ¶ 19).

However, beyond his blanket assertion in paragraph 32 that "all of the defendants[,] while acting under color of state law, have retaliated against [him] for filing grievances [and] seeking redress from the courts[,]" Plaintiff fails to specifically allege the defendants' awareness of his protected activity and that their actions were causally connected thereto.  Thus, he fails to provide sufficient factual support for his wholesale claims of retaliation.

The Second Amended Complaint also alludes to several of Plaintiff's prison write-ups and disciplinary proceedings, but fails to attribute any alleged constitutional violations stemming therefrom.  First, Plaintiff contends that, on January 22, 2018, he had a hearing on a write-up by Counselor Nancy Johnson for an alleged "sex act," and he states that he was found guilty by a hearing officer (who is not identified), despite "giving [him] a reason not to find [Plaintiff] guilty" and "without stating everything [he] stated at the hearing for [his] innocence." (*Id.* at 16-17, ¶ 31).  He summarily claims that this finding was in retaliation for the instant lawsuit.  (*Id.*)

Plaintiff further contends that, on April 21, 2018, Nurse Elizabeth Bailes ("Bailes") lied and accused him of compromising her to "help out" Correctional Officers Taylor and David Ewing ("Ewing").  (*Id.* at 15, ¶ 28).  He further alleges that Correctional Officer Jerrod Wilson ("J. Wilson"), who apparently served as a disciplinary hearing officer for at least one of Plaintiff's disciplinary proceedings, retaliated against him when he took away

Plaintiff's Good Conduct Time ("GCT") following a disciplinary hearing.  (*Id.* at 12, ¶ 21). However, Plaintiff does not specify the basis of that disciplinary hearing or provide any other specific facts concerning that proceeding.

The Second Amended Complaint also alleges that, on an unspecified date, Correctional Officer Kylee McCarthy ("McCarthy") falsely wrote Plaintiff up in a disciplinary report, which he also summarily claims was "a form of retaliation."  However, he again provides no specific facts about that write-up or the related disciplinary proceedings.  (*Id.* at 15-16, ¶ 28).  As further addressed *infra*, all of these allegations are too vague and conclusory to sufficiently state any federal constitutional claim or other claim upon which relief can be granted by this court.

Plaintiff further generally alleges that between August 2, 2018, and August 9, 2018, unspecified nurses let Ewing, Blankenship, and Correctional Officer Kin Bowlin ("K. Bowlin")[5] read his sick call requests or allowed them to take the requests and refuse to give them to medical personnel.  (*Id.* at 14, ¶ 25).  However, beyond listing the names of various nurses and other medical staff in the style of the case, Plaintiff's Second Amended Complaint does not allege any specific conduct by such medical personnel.  Nor does he allege any actual constitutional injury caused by the alleged conduct of these correctional officers.

Plaintiff also summarily contends that Clifford lied to him about money in his inmate account and "refused to have it fixed" and that his legal and regular mail was "not getting sent out like it should" or "getting to him in time or at all."  He further summarily

---

[5] Due to the difficulty in reading Plaintiff's handwriting, the court is unsure of the proper spelling of the first name of this defendant.  The Clerk read the first name to be "Ken."  However, it appears it may also be "Kin" or "Kim."  Due to this uncertainty, the undersigned will hereinafter refer to this defendant as "K. Bowlin."

claims that correctional officers and "post office of MOCC" have been reading his mail and his grievances. (*Id.* at 6, ¶¶ 6-7). However, the Second Amended Complaint document contains no further specific factual allegations concerning these claims and, thus, they are insufficient to give rise to any plausible claim for relief.

Plaintiff also summarily asserts that Terry, as Acting Warden, was aware of all of his problems with correctional officers and his pending lawsuits, but refused to stop "the wrongful actions" of his subordinates and co-workers. (*Id.* at 14, ¶ 24). Plaintiff further claims that Terry and "all his co-workers" knew about his medical and mental health issues and the failure to send him back for his follow-up medical appointments and were deliberately indifferent thereto. (*Id.*) As will be further addressed herein, these sweeping allegations are wholly insufficient to state any plausible claims for relief.

## II.   STANDARDS OF REVIEW

Where, as here, a prisoner is proceeding *in forma pauperis*, this court has a duty to "screen initial filings . . . to independently assess the merits of *in forma pauperis* complaints" and "exclude suits that have no arguable basis in law or fact." *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 656 (4th Cir. 2006) (citing *Nasim v. Warden*, 64 F.3d 951, 953–54 (4th Cir. 1995)); *see* 28 U.S.C. §§ 1915(e) and 1915A. The court must "dismiss a complaint filed *in forma pauperis* 'at any time if [it] determines that . . . the action or appeal . . . is frivolous or malicious . . . [or] fails to state a claim on which relief may be granted.'" *Eriline Co.*, 440 F.3d at 656 (quoting 28 U.S.C. § 1915(e)). That section also provides for dismissal where the complaint seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(iii). A similar screening provision governs all prisoner complaints filed against government entities. 28 U.S.C. § 1915A.

Pro se complaints are held to less stringent standards than those drafted by attorneys, and the court is obliged to liberally construe such complaints. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). Nonetheless, this liberal construction requirement does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a cognizable claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (outlining pleading requirements under Rule 8 of the Federal Rules of Civil Procedure for "all civil actions").

A pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) (stating that this requirement exists "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))). In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal, supra*, 556 U.S. at 679. This Court then "assume[s] the[] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.* Review of the complaint is "a context-specific task that requires [the Court] to draw on its judicial experience and common sense." *Id.*

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Stated another way, the factual allegations in the complaint "must be sufficient 'to raise a right to relief above the speculative level.'" *Woods*

14

*v. City of Greensboro*, 855 F.3d 639, 647 (4th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555). A complaint that alleges enough facts "to satisfy the elements of a cause of action created by [the relevant law]" will survive a motion to dismiss. *Id.* at 648 (quoting *McCleary-Evans*, 780 F.3d at 585).

"[T]o satisfy the plausibility standard, a plaintiff is not required to plead factual allegations in great detail, but the allegations must contain sufficient factual heft to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of that which is alleged." *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 452 (4th Cir. 2017) (internal quotation marks omitted). Moreover, a complaint must state more than "labels and conclusions" and a claim should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, it does not contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. The undersigned has applied these standards in the court's initial review of the remaining allegations in Plaintiff's Second Amended Complaint to determine the claims that should be permitted to proceed.

### III.   DISCUSSION

### A.   *Claims that fail to state a claim upon which relief can be granted*

1.      No allegations or conclusory allegations against certain defendants

Although Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" the pleading must "give[] fair notice and state[] the elements of the claim plainly and succinctly." 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 8.13 at 8–111 (2d Ed. 1983). Thus, "[c]onclusionary allegations, unsupported by facts, [will be] rejected as

insufficient to state a claim . . . ." *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977). A plaintiff must "allege with at least some degree of particularity overt acts which defendants engaged in" that support each of his claims. *Id., quoting Powell v. Workmen's Comp. Bd.*, 327 F.2d 131, 137 (2d Cir. 1964).

As noted above, "[t]he liberal construction requirement [afforded to *pro se* litigants] will not permit a district court to ignore a clear failure to allege facts in his complaint which set forth a claim that is cognizable under federal law." *Adams-Bey v. Rogers*, No. 3:17-cv-210-FDW, 2018 WL 1413196, *3 (W.D.N.C. Mar. 21, 2018) (*citing Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990)). Thus, a *pro se* complaint must still contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Id.* This "plausibility standard requires a plaintiff to demonstrate more than a sheer possibility that a defendant has acted unlawfully." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted). Quite simply, "[d]istrict judges have no obligation to act as counsel or paralegal to pro se litigants." *Pliler v. Ford*, 542 U.S. 225 (2004).

Plaintiff's Second Amended Complaint is rife with conclusory allegations with little to no specific facts concerning the conduct of many of the defendants; thus, it fails to provide fair notice of many of his claims against them. Borrowing from Judge Wilkinson's concurrence in *Evans v. Chalmers*, the allegations in the Second Amended Complaint "seek to sweep in everyone and everything, heedless of any actual indications of individual malfeasance that would justify the personal burdens that litigation can impose." *Evans v. Chalmers*, 703 F.3d 636, 662 (4th Cir. 2012) (Wilkinson, J, concurring).

First and foremost, the Second Amended Complaint contains <u>no allegations</u> whatsoever with respect to the following defendants, who are listed by name only in the

amended style thereof, as set forth in ECF No. 186:  Commissioner Betsy Jividen, Officer Edward Myles, Officer Charles Johnson, Officer Dustin Bell, Officer Gregory Stover, Officer Beltcher, Trustee Clerk Abbie Hart, Nurse Amanda Jones, Nurse Kelly Foster, Nurse Kristine Batten, M.R.C. Allison Miller, H.S.A. Pam Givens, MHU Staff Brandon Deem, MHU Staff Shannon Coleman, MHU Staff Tim Carper, and Operations Warden Teresa Gregory.  *See, e.g., Collins v. Kibort*, 143 F.3d 331, 334 (7th Cir. 1998) ("A plaintiff cannot state a claim against a defendant by including the defendant's name in the caption.").  Therefore, even under a liberal construction, the dearth of factual allegations against these proposed defendants in the Second Amended Complaint warrants their dismissal under the dictates of *Twombly* and *Iqbal*.  The Second Amended Complaint simply fails to state any plausible claims for relief against these individuals.

Additionally, with respect to the MHU staff members named in the Second Amended Complaint, in paragraphs 4 and 15 thereof, Plaintiff summarily alleges that "they either ignored the problems [he] raised or lied to him to make [him] stop speaking of the issues."  (ECF No. 79 at 4, ¶ 4).  However, he fails to allege any further specific overt acts by those individuals that would put them on notice of a plausible claim against them. Likewise, in paragraph 28, Plaintiff asserts that the MHU staff, without identifying any specific individuals or instances, failed to "give him the therapy he so desperately needs, harass him, [and] lied to him."  (*Id.* at 15-16, ¶ 28).  Such allegations are too conclusory to sufficiently state any plausible claim against those individuals and, thus, dismissal of the proposed claims against them is also warranted under *Twombly* and *Iqbal*.

Furthermore, the allegations in paragraphs 6 and 7 of the Second Amended Complaint (ECF No. 79 at 6, ¶¶ 6-7) are far too general and plead no specific conduct by particular individuals that could give rise to a plausible federal constitutional claim.  At

17

best, Plaintiff summarily alleges that unidentified correctional officers are reading his grievances and that his incoming and outgoing mail is not being timely delivered.  Again, however, he fails to attribute any specific conduct to particular staff members in order to move his claims from speculative to probable and to properly put the alleged defendants on notice of the claims against them.  Similarly, Plaintiff's unspecific allegation that Clifford lied to him about money in his inmate account is simply too conclusory to give rise to a cognizable claim for relief.  Thus, dismissal of these allegations is also warranted under the dictates of *Twombly* and *Iqbal*.

Plaintiff has attached numerous exhibits to his complaint documents and his multitude of other filings made throughout the course of this case.  It appears that he may be attempting to rely on the numerous grievances and other exhibits he has provided to offer factual support for the broad and vague allegations in the Second Amended Complaint document itself.  However, he may not rely on such documentation to substitute for or supplement his conclusory allegations.

In reviewing the sufficiency of a complaint, a court may consider a document attached to or referred to in the complaint so long as the document is integral to the complaint and there is no dispute about its authenticity.  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017); *Anderson v. Henderson*, No. CV ELH-20-480, 2021 WL 2155002, at *4 (D. Md. May 27, 2021).  However, to be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original); *see*

*also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Nevertheless, the various grievances and other documents that Plaintiff has attached to his Second Amended Complaint and other filings in this civil action are not "written instruments" as contemplated by Rule 10(c), and the court and the defendants need not comb through them searching for facts to support Plaintiff's threadbare allegations in his Second Amended Complaint. *See Walker v. Prince George's Cty., MD,* 575 F.3d 426, 429 (4th Cir. 2009), *quoting United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *see also Robinson v. Unknown,* No. 7:13-cv-00414, 2013 WL 5591936, at *1 (W.D. Va. Oct. 10, 2013) (Disregarding 400 pages of exhibits, including prison grievances and administrative records, in considering the sufficiency of a complaint and finding that "[i]t is Plaintiff's obligation, not the court's, to construct a legally viable claim in accordance with Rules 8 and 10" of the Federal Rules of Civil Procedure).

## 2. Fourth Amendment claims

The Second Amended Complaint also summarily asserts that Plaintiff's Fourth Amendment rights were violated; however, he fails to tie any specific conduct by individual defendants to this alleged violation. Nevertheless, a liberal reading of paragraphs 8, 18, and 28 of the Second Amended Complaint suggests that Plaintiff may be alleging that the searches of his prison cells and seizure of certain personal property therein constituted a Fourth Amendment violation. (ECF No. 79 at 7, ¶ 8, 11, ¶ 18, and 15, ¶ 28). However, such a claim fails as a matter of law.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. However, an inmate has no "reasonable expectation

of privacy in his prison cell entitling him to the protection of the Fourth Amendment against unreasonable searches and seizures." *Hudson v. Palmer*, 468 U.S. 517, 536 (1984); *see also Crisano v. Grimes,* No. 1:19-cv-1612, 2021 WL 120943, at *14 (E.D. Va. Jan. 12, 2021) ("Crisano therefore had no Fourth Amendment protection in the contents of her cell, and the defendants were legally able to search her cell for any reason.").  At best, Plaintiff's Second Amended Complaint appears to suggest that correctional officers (some identified, and others not identified)[6], conducted searches of his inmate cells, took some of his personal property, and left his cells in disarray.  As Plaintiff has no recognized Fourth Amendment rights under such circumstances, any claims under the Fourth Amendment alleged in the Second Amended Complaint fail as a matter of law and should be dismissed.

3.    Fifth Amendment claims.

The Second Amended Complaint also summarily asserts that the defendants violated his Fifth Amendment rights.  (ECF No. 79 at 17, ¶ 32). It appears that Plaintiff may be relying on this amendment to support his claims that his due process rights were somehow violated.  However, the Fifth Amendment Due Process Clause only protects against due process violations caused by the federal government. *See Public Utilities Comm'n v. Polak*, 343 U.S. 451, 461 (1952).  As Plaintiff has only alleged wrongful conduct by state actors, their conduct is governed by the Fourteenth Amendment (which will be addressed below), and the Fifth Amendment Due Process Clause has no application to his due process claims.  Moreover, Plaintiff has not alleged any facts to support any other

---

[6] The only specific defendants alleged by Plaintiff to have been involved in such conduct are Lt. Hill and Sgt. Smith.  (*Id.* at 11, ¶ 18).  Otherwise, the Second Amended Complaint only makes wholesale allegations concerning unspecified correctional staff.

cognizable claim under the Fifth Amendment.  Accordingly, his alleged Fifth Amendment claims must be dismissed.

4.      Ninth Amendment claims.

Similarly, Plaintiff's conclusory allegations do not give rise to any plausible claims for relief under the Ninth Amendment.  The Ninth Amendment only protects those rights not otherwise "enumerat[ed] in the Constitution," U.S. CONST. amend. IX.  As addressed below, Plaintiff's factual allegations may well support specific cognizable claims under the Eighth Amendment and West Virginia tort law, thus negating any need for reliance on the Ninth Amendment.

5.      Fourteenth Amendment claims.

Plaintiff also summarily alleges that the defendants, as state actors, violated his right to due process of law, which, as noted above, is a guarantee protected by the Fourteenth Amendment's Due Process Clause, where the plaintiff can establish a valid liberty or property interest.  (ECF No. 79 at 17, ¶ 32).  Again, however, Plaintiff does not tie any specific conduct by individual defendants to such alleged violations.

A liberal reading of the Second Amended Complaint suggests that Plaintiff may be asserting a due process claim grounded in his prison disciplinary proceedings, including his allegation that Defendant J. Wilson, who served as a hearing officer in some of his disciplinary hearings, took away GCT.[7]  (ECF No. 79 at 12, ¶ 21).  Prisoners retain rights

---

[7]  The loss of GCT has been found to give rise to a protected liberty interest under the Fourteenth Amendment.  *See Wolff v. McDonnell*, 418 U.S. 539, 557 (1974); *Lennear v. Wilson*, 937 F.3d 257, 268 (4th Cir. 2019).  Otherwise, in order to establish a valid liberty interest to support a due process claim, Plaintiff must allege and demonstrate the imposition of an "atypical and significant hardship in relation to ordinary prison life."  *See Sandin v. Conner*, 515 U.S. 472, 478 (1995).  Plaintiff's pleading contains insufficient allegations and factual support to satisfy that element.  "The Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner" and Plaintiff's wholly conclusory allegations in the Second Amended Complaint fail to meet his pleading burden.  *Id.*

under the Due Process Clause, but prison disciplinary proceedings are not part of a criminal prosecution. Therefore, the full array of rights that are due to the criminal defendant do not apply in the prison discipline context. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (*citing Morrissey v. Brewer*, 408 U.S. 471, 488 (1972)).

Rather, in prison disciplinary proceedings where an inmate faces the possible loss of good time credit, he is entitled to only limited due process protections consisting of: (1) advance written notice of the charges against him; (2) a written statement of the evidence relied on and the reasons for taking any disciplinary action; (3) a hearing where he is afforded the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and correctional concerns, and a written decision; (4) the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary hearing involves complex issues; and (5) an impartial decision-maker. *See Wolff,* 418 U.S. at 564-71. However, there is no constitutional right to confront and cross examine witnesses or to retain and be appointed counsel. *See Baxter v. Palmigiano*, 425 U.S. 308, 322 (1976); *Brown v. Braxton*, 373 F.3d 501, 505-06 (4th Cir. 2004).

Moreover, so long as the hearing officer's decision contains a written statement of the evidence relied upon in making a ruling, procedural due process requirements are satisfied. *See Baxter*, 425 U.S. at 323 n.5. Additionally, substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence." *Superintendent, Mass. Corr. Institute v. Hill*, 472 U.S. 445, 455 (1985). Federal courts do not review the correctness of a disciplinary hearing officer's findings of fact. *See Kelly v. Cooper*, 502 F. Supp. 1371, 1376 (E.D. Va. 1980). Therefore, the findings will only be disturbed when unsupported by any evidence, or when wholly arbitrary and capricious. *See Hill*, 472 U.S. at 456*; see also Baker v. Lyles*, 904 F.2d 925, 933 (4th Cir. 1990). If

there is some evidence in the record to support a disciplinary committee's factual findings, a federal court will not review their accuracy.

Here, Plaintiff provides no facts to identify the particular disciplinary proceeding that resulted in his loss of GCT and he fails to specifically identify any aspect of the process he is challenging as being unconstitutional.  Nor has he identified any other specific proceeding(s) that he may be challenging with this claim.  Elsewhere in the Second Amended Complaint, Plaintiff states that he was written up by Nancy Johnson for a "sex act."  He further alleges that, after his hearing on that charge on January 22, 2018, the hearing officer found him guilty, despite the fact that he "stated enough facts to give the hearing officer a reason not to find [him] guilty."  (ECF No. 79 at 16, ¶ 31).  However, again, Plaintiff does not provide any specific facts about this proceeding or what sanctions he suffered as a result.  Plaintiff further summarily contends that Correctional Officer Kylee McCarthy falsely wrote him up on a disciplinary charge, but, again, he provides no further factual allegations concerning that proceeding or its outcome.  (*Id.* at 16, ¶ 28).  These conclusory allegations are insufficient to give rise to any plausible due process claim.

Plaintiff's Second Amended Complaint also summarily suggests that the alleged interference by correctional staff with the processing of his grievances violated his due process rights.  (ECF No. 79 at 18, ¶ 33).  However, because "there is no constitutional right to participate in grievance proceedings, *see Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (*citing Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)), Plaintiff's assertion that his due process rights were violated by interference with the grievance process is legally

frivolous and should be dismissed.[8]  *See also Newkirk v. Chappell*, No. 3:13-cv-73-HEH, 2013 WL 5467232, at *3 (E.D. Va. Sept. 30, 2013); *Cromartie v. N. Carolina Dep't of Safety*, No. 1:17-cv-980, 2020 WL 4926633, at *6 (M.D.N.C. Aug. 21, 2020), *report and recommendation adopted sub nom. Cromartie v. N.C. Dep't, of Pub. Safety*, No. 1:17-cv-980, 2020 WL 5518480 (M.D.N.C. Sept. 14, 2020) ("the Constitution affords no substantive due process right to a prison grievance procedure.").

Thus, even liberally construed, Plaintiff's allegations fail to provide specific facts to move his proposed due process claims above the speculative level and fail to put any particular defendant on notice of a plausible Fourteenth Amendment claim against him or her.  His threadbare allegations amount to nothing more than labels and conclusions and, thus, dismissal of all of these allegations is warranted under the dictates of *Twombly* and *Iqbal*.

### 6.    First Amendment claims/allegations of retaliation

Overarching the rest of his claims is Plaintiff's contention that the defendants have retaliated against him due to his filing of prior litigation against officials at HCC, as well as the filing of grievances and the instant lawsuit against MOCC officials.  It is well-established that prison officials may not retaliate against prisoners for exercising their right to access the courts or for filing prison grievances.  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544-45 (4th Cir. 2017); *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978); *see also Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (recognizing First Amendment right to petition for redress of grievances).  In order to state a plausible claim of retaliation for exercising First Amendment rights, Plaintiff must show that (1) he

---

[8]  The undersigned will separately address Plaintiff's contention with respect to the exhaustion of administrative remedies.  Nonetheless, such allegations fail to state a stand-alone due process claim.

engaged in protected First Amendment activity; (2) a defendant took some action that adversely affected his First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). Where retaliatory conduct would "deter a person of ordinary firmness from the exercise of First Amendment rights," the claim may proceed. *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500).

However, retaliation claims in the prison context "should be treated with skepticism because even legitimate acts of discipline taken by prison officials are in some sense retaliatory." S*ee Cochran v. Morris,* 73 F.3d 1310, 1317 (4th Cir. 1996) (finding that the district court did not abuse its discretion in dismissing plaintiff's claims of retaliation where they lacked a nexus to the misconduct alleged); *see also Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (To survive summary dismissal, a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing each element of such claim); *accord Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003). "[T]he plaintiff must show that the defendant's retaliatory action was substantially motivated by the plaintiff's decision to exercise a constitutionally protected right, and that the action impaired the exercise of that right. *See ACLU v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993).

While Plaintiff's complaint must be read liberally, the court is "not required to piece together causes of action from fragmentary factual recitations." *See Cochran*, 73 F.3d at 1318. As noted previously herein, specificity is necessary so that prison officials are not required to file unnecessary responses to speculative allegations. *Id.* at 1317.

Moreover, "[b]ecause prisoner retaliation claims are 'easily fabricated . . . and . . . pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration,' courts must insist that such claims are bound up in facts, not in the gossamer strands of speculation and surmise." *Hannon v. Beard*, 645 F.3d 45, 48 (1st Cir. 2011) (*quoting Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks omitted). Plaintiff's wholesale allegations are insufficient to properly assert cognizable and plausible retaliation claims under the First Amendment.

Plaintiff makes blanket assertions that <u>all</u> of the defendants have engaged in retaliatory conduct against him without any plausible suggestion of a causal connection between the conduct alleged in his Second Amended Complaint and his engagement in activity protected by the First Amendment. "Retaliation is not established simply by showing adverse activity by [a] Defendant after protected speech; Plaintiff must show a nexus between the two." *Williams v. Fox*, No. 1:16-cv-00143, 2017 WL 916432, * 7 (D. Idaho Mar. 7, 2017). Thus, Plaintiff must allege more than his own speculative belief that he is the victim of retaliation. For example, a conclusory allegation that a correctional officer "wrote me up for revenge" is insufficient to state a plausible retaliation claim and fails to allege a plausible nexus between specific protected activity and the alleged conduct of the defendant. *See Bouknight v. Shaw,* No. 08 Civ. 5187, 2009 WL 969932, at *6 (S.D.N.Y. Apr. 6, 2009). Therefore, "[c]ourts must be wary of allowing inmates to claim retaliation every time some action is taken against them, particularly in matters involving institutional security." *Crenshaw v. Hartman*, 681 F.Supp.2d 412 (W.D.N.Y. 2010).

Plaintiff's Second Amended Complaint contains a litany of speculative and conclusory allegations concerning alleged retaliatory conduct by numerous defendants for which he largely fails to identify either the specific individual(s) involved or the time

and place where such alleged conduct occurred and, most significantly, it fails to allege facts sufficient to establish a causal connection between the alleged conduct of each of the defendants and his engagement in protected activity.  Rather, he merely sweepingly contends that all of the defendants were aware of his prior filing of grievances and lawsuits and speculates that they were somehow substantially motivated by his protected activity to engage in various adverse actions against him.  These threadbare allegations are far too conclusory to maintain plausible First Amendment retaliation claims against any of the defendants herein.

    7.  Supervisory liability claims.

   The Second Amended Complaint also contains several stray allegations concerning the failure of Defendants McKinney and Terry to review video footage in the course of their review and denial of several of his grievances.  However, these threadbare and conclusory allegations, stating little more than the role of these Defendants in the denial of Plaintiff's grievances, are insufficient to state any plausible claims against them. *See, e.g., Larson v. Meek*, 240 F. App'x 777, 780 (10th Cir 2007) (inadequacy of allegations involving supervisory liability based on denial of grievances); *Ferris v. Jones*, No. 4:14-cv-454, 2015 WL 4668297, at *9 (N.D. Fla. Aug. 5, 2015) (granting a motion to dismiss for failure to state a claim of supervisory liability claims predicated on the denial of grievances); *Lowe v. Matheney*, No. 2:13-cv-22416, 2015 WL 5795867 *9 (S.D.W. Va. Sept. 30, 2015) (Goodwin, J.) (inadequacy of allegations involving supervisory liability claim based upon denial of grievances).

   Moreover, the allegations against Terry in paragraph 24 are also too conclusory to state a plausible claim of supervisory liability.  It is well-settled within the Fourth Circuit that, to be liable under such a theory, a supervisor, by his own conduct, must have been

deliberately indifferent to, or tacitly authorized or approved, constitutional violations by his or her subordinates. *See Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994). Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.* at 798 (*quoting Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984)).

The *Shaw* Court discussed the following elements necessary to establish a supervisor's liability under 42 U.S.C. § 1983:

> 1) The supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; 2) The supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices;" and 3) There was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

13 F.3d at 799. However, in *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court clarified that a prison official's "actual subjective awareness" of an excessive risk of harm or safety was required to hold the official liable under the Eighth Amendment. Thus, a prison official cannot be held liable for the failure to alleviate a risk that he should have perceived, but did not in fact perceive. 511 U.S. at 838. As further noted by the Fourth Circuit in *Evans v. Chalmers*:

> [T]he Supreme Court explained in *Iqbal* that "a supervisor's mere knowledge" that his subordinates are engaged in unconstitutional conduct is insufficient to give rise to liability; instead a supervisor can only be held liable for "his or her own misconduct." [556 U.S. at 677.]

703 F.3d 636, 660-61 (4th Cir. 2013). Thus, to hold a supervisory defendant, such as Terry, liable, Plaintiff must allege facts that allow the court to draw a reasonable inference that the supervisor's own conduct permitted a specific constitutional violation to occur.

*Iqbal*, 556 U.S. at 677.   Accordingly, "a plaintiff must plead that each [supervisory] defendant, through the official's own individual actions, has violated the Constitution." *Id*. at 676.  In the Second Amended Complaint herein, Plaintiff summary assertions that Terry was "aware of his problems with the COs and the pending lawsuits" but "refused to stop the wrongful actions of his co-workers" (ECF No. 79 at 14, ¶ 24) are simply too threadbare and conclusory to cross "the line from conceivable to plausible." *Id*. at 680. Thus, these allegations are also subject to summary dismissal.

8.    State constitutional claims.

Plaintiff's Second Amended Complaint also alleges that the defendants' conduct violated three sections of the West Virginia Constitution.  In particular, he makes the blanket statement that the defendants violated Article III, §§ 1, 5, and 10 thereof. However, section 1, entitled "Bills of Rights," "is a statement of the basic principle on which our entire democratic structure is founded, and has not been applied in circumstances such as these."  *Krein v. W. Va. State Police*, No. 2:11-cv-00962, 2012 WL 2470015, at *6 (Jun. 27, 2012) (quoting *Allen v. State Human Rights Comm'n*, 324 S.E.2d 99, 109 (W. Va. 1984)).  Thus, there is no independent cause of action under Article III, § 1.  *See Harper v. Barbagallo*, No. 2:14-cv-07529, 2016 WL 5419442, at *14 n.7 (S.D.W. Va. Sept. 27, 2016); *see also Murray v. Matheny*, No. 2:13-cv-15798, 2017 WL 4849113, at *8 (S.D.W. Va. Oct. 26, 2017).

Similarly, upon certified question from this court, the Supreme Court of Appeals of West Virginia (the "SCAWV") recently found that there is no private right of action for damages under Article III, § 6 of the West Virginia Constitution, which is the functional equivalent of the Fourth Amendment.  *See Fields v. Mellinger*, 851 S.E.2d 789, 795 (W. Va. 2020).  The *Fields* Court was asked to clarify the Court's prior holding in *Harrah v.*

*Leverette*, 271 S.E.2d 322 (W. Va. 1980), *superseded by statute on other grounds as recognized by W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 774 n.30 (W. Va. 2014).

In *Harrah*, the SCAWV determined that Article III, § 5 of the West Virginia Constitution, which is the functional equivalent of the Eighth Amendment, specifically provided for remedies in the form of injunctive relief, a federal cause of action under 42 U.S.C. § 1983, and a civil tort action, leaving open for interpretation whether an independent cause of action for money damages is recognized under that state constitutional provision.  Since that decision, federal courts in this state have been divided over whether such an independent cause of action may be pursued.  *See, e.g., Billiter v. Jones*, No. 3:19-cv-0288, 2020 WL 118595, at *5 (S.D.W. Va. Jan. 9, 2020) (determining that money damages were not available for claims under Article III, Sections 7 and 16 of the West Virginia Constitution, but observing that "[t]he Supreme Court of Appeals did, however, authorize injunctive relief in *Harrah v. Leverette* for an article III, section 5 claim" (emphasis added)); *Murray v. Matheney*, No. 2:13-cv-15798, 2017 WL 4849113, at *8 (S.D.W. Va. Oct. 26, 2017) (granting summary judgment to defendants as to plaintiff's claims for money damages for violations of Article III, Section 5 of the West Virginia Constitution, because "monetary damages under the West Virginia Constitution [are] outside the scope of those contemplated by the *Harrah* court"); *McMillion-Tolliver v. Kowalski*, No. 2:13-cv-29533, 2014 WL 1329790, at *2 (S.D.W. Va. Apr. 1, 2014) (concluding that "[t]he *Harrah* court did not include a cause of action under the state constitution for money damages among the remedies it listed"); *but see, e.g., Davis v. Milton Police Dep't*, No. 3:20-cv-0036, 2020 WL 2341238, at *6 (S.D.W. Va. May 11, 2020) (Chambers, J.); *Cummings v. City of Wheeling*, No. 5:19-cv-271, 2019 WL

6609693, at *5 (N.D.W. Va. Dec. 5, 2019) (Stamp, J.); *Spry v. State of W. Va.*, No. 2:16-cv-01785, 2017 WL 440733, at *9 (S.D.W. Va. Feb. 1, 2017) (Johnston, J.).

Although Article III, § 5 was not directly addressed by the SCAWV in *Fields*, the Court stated that "[t]here simply is no language in *Harrah* adopting an implied cause of action for a constitutional violation[]" and "the district courts that have concluded '[t]he *Harrah* court did not include a cause of action under the state constitution for money damages among the remedies it listed' have properly interpreted this case." 851 S.E.2d at 795 (citing *McMillion-Tolliver*, 2014 WL 1329790, at *2). Thus, it appears that the court has not recognized a claim for damages under Article III, § 5 of the West Virginia Constitution. As Plaintiff has separate claims for relief under the Eighth Amendment and state law claims of assault and battery, he is not without remedy for his claims of cruel and unusual punishment, including his conclusory request for injunctive relief. Thus, the court should dismiss his claims under Article III, § 5.

Finally, Article III, § 10 is "West Virginia's equivalent to the federal Due Process Clause." *Harper v. Barbagallo*, No. 2:14-cv-07529, 2016 WL 5419442, at *13 (S.D.W. Va. Sept. 27, 2016). Although the SCAWV previously recognized a private right of action under that section, *see Hutchison v. City of Huntington*, 479 S.E.2d 649 (W. Va. 1996), because the undersigned has found that the Second Amended Complaint herein does not state any viable due process claims, Plaintiff's claims under Article III, § 10 should also be dismissed.

### B.   *Claims that warrant further development*

Based upon an exhaustive review of the Second Amended Complaint, the undersigned finds that it does state some facts which could support plausible claims for

relief under the Eighth Amendment of the United States Constitution against certain defendants, which will be discussed in turn.

The Eighth Amendment protects convicted prisoners from cruel and unusual punishment by state actors. In *Farmer*, *supra*, the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" 511 U.S. at 832. This is a low standard. The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" *Id*. at 833.

To sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety." *Id*. at 834. (Citations omitted.) The Supreme Court rejected an argument that an objective test of deliberate indifference be established.

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id*. at 837.

Plaintiff's factual allegations concerning the alleged failure to provide adequate medical treatment, liberally construed, are sufficient to give rise to plausible claims of deliberate indifference to serious medical needs that are cognizable under the Eighth

Amendment and warrant further development.  However, such claims only encompass specific factual allegations against Defendants Lye and Shrewsberry.  Specifically, in paragraphs 26 and 28, Plaintiff alleges that Lye and Shrewsberry refused to have his ears tested with respect to the ringing noise he allegedly hears and never sent him back for his follow-up appointments at Ruby with respect to his pre-existing medical conditions and that his medical problems worsened.  (ECF No. 79 at 4, ¶ 4 and 14-15, ¶¶ 26, 28).

Moreover, Plaintiff's allegations in paragraphs 10, 14, and 29 of the Second Amended Complaint concerning the alleged threats and attacks by gang members, and the failure of Defendants Mitchell, Snider, Frame, and Ballard to place him in Special Management, or to otherwise protect him from an alleged known risk of harm from other prisoners, are sufficient to give rise to Eighth Amendment claims against those individuals that warrant further development.  (ECF No. 79 at 7-9, ¶¶ 10 and 14, and at 16, ¶ 29).

Similarly, Plaintiff's numerous allegations concerning alleged uses of excessive force against him by various correctional officers, liberally construed, are sufficient to give rise to cognizable claims under the Eighth Amendment, such that those claims warrant further development.[9]  The undersigned finds that those claims are sufficiently alleged against Isaac, Baker, Santiago, Rose, Hayhurst, Hypes, Woods, Blankenship, J. Bowlin, Taylor, Legg, Slack, Sgt. Smith, Lt. Smith, Clifford, and Mitchell.

C.    *Exhaustion of Administrative Remedies*

Section 1997e(a) of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), was enacted "to address concerns about the 'ever-growing number of prison

---

[9] To the extent that the Second Amended Complaint may state plausible Eighth Amendment claims arising out of the alleged excessive use of force against Plaintiff, it may also state plausible claims of assault and battery under West Virginia law against those same defendants.

condition lawsuits that were threatening to overwhelm the capacity of the federal judiciary.'" *Green v. Young*, 454 F.3d 405, 406 (4th Cir. 2006) (*quoting Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 676 (4th Cir. 2005)). "The PLRA imposes some rather substantial limitations on a prisoner's ability to initiate a civil action." *Id.* One such limitation is the requirement that prisoners properly exhaust administrative remedies within the prison before filing a civil action. *Id.*; *see also* 42 U.S.C. § 1997e(a). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Wells v. Parkersburg Work Release Ctr. et al.*, No. 2:15-cv-04103, 2016 WL 696680, at *3 (S.D.W. Va. Jan. 19, 2016) (citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)).

Like the PLRA, the West Virginia Prison Litigation Reform Act ("WVPLRA") "require[s] inmates to exhaust their administrative remedies before they bring a lawsuit." *Legg v. Adkins*, No. 2:16-cv-01371, 2017 WL 722604, at *2 (S.D. W. Va. 2017) (citing 42 U.S.C. § 1997e(a); W. Va. Code § 25-1A-2a(i)). Under the WVPLRA, "[a]n inmate may not bring a civil action regarding an ordinary administrative remedy until the procedures promulgated by the agency have been [fully] exhausted." W. Va. Code § 25-1A-2(c).

Exhaustion of administrative remedies is an affirmative defense which must be raised and demonstrated by the defendants, and a plaintiff is not required to specially plead or demonstrate exhaustion in his complaint. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008); *see also Anderson, supra*, 407 F.3d at 681 (exhaustion of administrative remedies is an affirmative defense to be raised by defendant); *Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007) (the burden of proof for failure to exhaust PLRA administrative remedies lies with the

defendant). Whether an administrative remedy has been exhausted for purposes of the PLRA "is a question of law to be determined by the judge." *Creel v. Hudson*, No. 2:14-cv10648, 2017 WL 4004579, at *3 (S.D.W. Va. 2017) (*citing Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010)). If a plaintiff fails to exhaust available administrative remedies under the PLRA or WVPLRA, then the defendant is entitled to judgment as a matter of law on the corresponding claim. *See Legg v. Adkins*, No. 2:16-cv-01371, 2017 WL 72604, at *2 (S.D.W. Va. Feb. 23, 2017).

In *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016), however, the Supreme Court held that "the exhaustion requirement hinges on the 'availability' of the administrative remedies. An inmate . . . need not exhaust unavailable remedies." *Id*. The Court further defined "available" as "'capable of use' to obtain 'some relief for the action complained of.'" (*Id*. at 1859, c*iting Booth v. Churner*, 532 U.S. 731, 738 (2001)).

Exhaustion of administrative remedies is clearly at issue in this matter. In prior proceedings herein, the undersigned reviewed and questioned the parties about the prolific number of grievance documents that have been filed as exhibits herein and suggested that, for purposes of judicial economy, the court would attempt to reduce the claims to be litigated (and, thus, limit the need for service of process on the multitude of additional proposed defendants) to claims against defendants that were properly exhausted. However, the undersigned has subsequently determined that its ability to consider the exhaustion issue *sua sponte* on initial screening is foreclosed by the Fourth Circuit's decision in *Custis v. Davis*, 851 F.3d 358 (4th Cir. 2016).

In *Custis*, the Court held that the district court improperly examined, *sua sponte*, Custis's administrative exhaustion requirement because, notwithstanding any

opportunity for the plaintiff to respond on the issue, the failure to properly exhaust was not apparent from the face of the complaint. *Id.* at 362. Specifically, the Court held:

> [P]ermitting courts to sua sponte screen complaints and demand further documentation of exhaustion in such circumstances would frustrate the principles laid out in *Jones* and turn the affirmative defense into a pleading requirement. *See, e.g.*, *Byrd v. Stirling*, 144 F. Supp.3d 803 (D.S.C. 2015) (dismissing complaint for failure to exhaust administrative remedies because complaint failed to affirmatively demonstrate exhaustion and district court gave inmate "opportunity" to respond by demanding documentation of exhaustion). Indeed, the district court's actions here—requiring Custis, whose complaint was unclear, to demonstrate exhaustion, and considering this requirement an opportunity to address exhaustion—demonstrate the tension between *Anderson* and *Jones*. As a result, to the extent that *Anderson* allows courts to sua sponte dismiss complaints where exhaustion is unclear so long as an inmate receives only an opportunity to address the issue, it is irreconcilable with *Jones* and cannot survive.

*Id.* at 363. Moreover, the Court noted that, where the issue of availability of the exhaustion process is unclear, such circumstances would not present the "rare and exceptional instance where administrative exhaustion was apparent on the complaint's face." *Id.* at 362.

From the outset of this litigation, Plaintiff has asserted that correctional and administrative staff at MOCC have allegedly interfered with the grievance process by failing to turn in and assign grievance numbers to certain grievances, failed to copy and return certain grievances to him in a timely manner so that he could properly appeal the same, and made his grievances "disappear," all in an alleged effort to "block" his ability to properly exhaust his claims and pursue the same in court. His Second Amended Complaint contains a section titled "Exhaustion of Administrative Remedies" that specifically states:

> The plaintiff has made every attempt to resolve all of these complaints and claims herein through his administrative remedies. At times [he] was unable to do so because they were blocked (destroyed or held hostage) until a later date by the herein named officials.

(ECF No. 79 at 18, ¶ 33). Thus, there is a colorable question concerning the availability of the administrative remedy process with respect to at least some of Plaintiff's remaining claims, which will likely need to be resolved by the court after responsive pleadings are filed. The Fourth Circuit, as well as several judges of this court, have recently held that, where the availability of the exhaustion process is in dispute, or the record is too limited to determine the availability thereof, such cases would not meet the rare circumstance where *sua sponte* consideration of the exhaustion defense would be appropriate. *See Myles v. Edwards*, 813 F. App'x 130 (4th Cir. Jul. 24, 2020) (vacating *sua sponte* dismissal based upon failure to exhaust where record concerning availability of administrative remedy process was contradictory); *Williams v. Rashed*, No. 5:19-cv-00159, 2020 WL 5848567, *1-2 (S.D.W. Va. Sept. 30, 2020) (Volk, J.) (where inference is raised that exhaustion process was unavailable, the exhaustion defense was not apparent from the face of the amended complaint and did not qualify for the rare circumstance permitting *sua sponte* dismissal on initial screening); *cf Sullivan v. King*, 2:17-cv-02347, 2018 WL 651815, *5 (S.D.W. Va. Jan. 8, 2018) (finding that dismissal for failure to exhaust was premature due to the limited record and the fact that such failure was not apparent from the face of the complaint).

Consequently, notwithstanding the prior representations to the parties, the undersigned **FINDS** that the circumstances in this matter do not qualify as one of the rate instances where the court may and should take up the issue of exhaustion of administrative remedies *sua sponte* on initial screening. Rather, that issue appears to be more appropriately addressed as an affirmative defense by the defendants in their responsive pleadings after service of process, with the opportunity for a more detailed response thereto from Plaintiff.

## IV.   RECOMMENDATIONS

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge dismiss the following defendants and claims under 28 U.S.C. § 1915A and 1915(e)(2)(B) for failure to state a claim upon which relief can be granted:  all claims against Commissioner Betsy Jividen, Officer K. Bowlin, Officer David Ewing, Officer Edward Myles, Officer Charles Johnson, Officer Kylee McCarthy, Officer Jerrod Wilson, Officer Kelly Minter, Officer Dustin Bell, Officer Gregory Stover, Officer Beltcher, Officer Matthew Ellis, Lt. Christopher Wilson, Lt. Andrew Hill, Lt. Josh Ward, Counselor Nancy Johnson, Trustee Clerk Abbie Hart, Nurse Elizabeth Bailes, Nurse Kristine Batten, Nurse Amanda Jones, Nurse Kelly Foster, M.R.C. Allison Miller, H.S.A. Pam Givens, MHU Staff Brandon Deem, MHU Staff Shannon Coleman, MHU Staff Tim Carper, MHU Staff Sara Cooper, Operations Warden Teresa Gregory, Capt. David McKinney, and Acting Warden Ralph Terry; as well as all claims brought under the First, Fourth, Fifth, Ninth, and Fourteenth Amendments of the United States Constitution and Article III, sections 1, 5, and 10 of the West Virginia Constitution.

However, the undersigned has also found that the Second Amended Complaint contains plausible claims under the Eighth Amendment, as well as state law claims of assault and battery, arising out of the various uses of force against Plaintiff, which warrant further development.  Those claims are brought against:  Officer Matthew Isaac, Officer Kevin Baker, Officer Skylar Santiago, Officer Dustin Rose, Officer Dylan Hayhurst, Officer Matthew Hypes, Officer John Woods, Officer John Blankenship, Cpl. John Bowlin, Cpl. James Taylor, Sgt. Charles Legg, Sgt. Donald Slack, Sgt. Jamie Smith, Lt. James Smith, and Capt. Margaret Clifford.

Additionally, the Second Amended Complaint states plausible Eighth Amendment claims arising out of deliberate indifference to serious medical needs by Dr. Charles Lye and P.A. Josh Shrewsberry that warrant further development.   Finally, the Second Amended Complaint contains plausible Eighth Amendment claims against David Ballard, Capt. Margaret Clifford, Jonathan Frame, Sgt. Andy Mitchell, and Sherill Snyder, arising out of the alleged failure to protect Plaintiff from harm from threats and assaults by other inmates.

In light of these findings, by separate Order, the undersigned will direct service of the Second Amended Complaint on the defendants implicated in those claims who have not yet been served with process and will address a future schedule for additional proceedings against those defendants.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, Extension of this time period may only be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*,

727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to the opposing parties and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Plaintiff, and to transmit a copy to counsel of record.


August 5, 2021

Dwane L. Tinsley
United States Magistrate Judge